IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALTINA STRONG as next friend of JAVON JONES, a minor | ) ) ) | 10 C 1497 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| OFFICER BYRON JACKSON AND THE CITY OF CHICAGO, A MUNICIPAL CORPORATION | ) ) ) ) ) | Hon. Charles R. Norgle |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court is Defendants Officer Byron Jackson's ("Jackson") and the City of Chicago's joint motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons, the motion is denied.

### I. INTRODUCTION

**A. Facts**[1]

Plaintiff Altina Strong is the natural mother and next friend of Plaintiff Javon Jones ("Jones"). At the time of the arrest at issue, Jones, an African-American male, was fourteen-years-old.

On February 15, 2010, Chicago police officer Barbara Jenkins ("Jenkins") and her partner Rodney Sowell ("Sowell") were on patrol when they were flagged down by a man near 65th Street and Cottage Grove in Chicago, Illinois. The man told the officers that there were several young people standing around, causing a "disturbance" in the

---

[1] The Court takes the factual background from the parties' statements of uncontested material facts pursuant to Local Rule 56.1. Contested facts are so noted.

area. Defs.' L.R. 56.1 Statement ¶ 13. Jenkins then saw a group of about six teenage boys standing outside of a Family Discount store on the corner of 65th Street and Cottage Grove, one of whom was Jones. Jenkins and Sowell pulled up to the store in their police car.

Prior to the officers' arrival, Jones had purchased chips and a drink at the Family Discount store. He was with his friends outside of the store for approximately ten to fifteen minutes before the officers arrived. No one from the store had asked Jones or his friends to leave the area.

It is undisputed that as, or shortly after, the officers arrived at the store, all of the boys ran in different directions. Jones, together with his friend Jhari White ("White"), ran east toward Maryland Avenue, which is one block away from Cottage Grove.

The parties dispute what happened immediately before and after Jones ran. Jones states that he started to run before the officers exited their car, that he did not hear either officer say anything to him, and that he ran along the sidewalk on 65th Street. Jenkins, by contrast, testified that she exited the police car and approached the boys in order to conduct a field interview to find out the nature of the disturbance, at which time they all scattered in different directions. Jenkins testified that she told Jones to stop running and that he did not obey her order. Jenkins further testified that Jones did not run along the sidewalk but rather ran in the street against traffic. Jenkins lost site of Jones and did not run after him.

There is no dispute that, after the boys ran, Jenkins and/or Sowell made a call over the police radio requesting officer assistance at the scene. The defendant officer, Jackson, was on duty with his partner, Officer Normand, when he heard the call over the

radio and responded. The message was limited and non-specific. According to Jackson, the call alerted him "that someone was running from the area of 64th and Cottage Grove. They described what they had on, and he was holding their [sic] side." Pls.' L.R. 56.1 Statement ¶ 11. The parties agree that Jackson believed the phrase "running holding his side" to mean that the individual may be carrying a gun, but Jones contends that Jackson's belief is not reasonable. For the purposes of this motion, the Court finds that, drawing all inferences in Jones's favor, the radio call did not state that the "someone" who was running had committed or was committing a crime, nor did it state that the fleeing boy(s) should be arrested.[2]

When Jackson arrived at the scene, an unnamed officer told him that Jones and White had run into a gangway between two buildings nearby. Jackson entered the gangway and, shortly thereafter, found Jones and White hiding in a "cut out" that was visible from the gangway, but not from the street. Jackson was alone when he found Jones and White.

The parties dispute what happened next. Jackson states that, when he saw Jones and White, he told them to turn around and put their hands behind their backs. Jackson testified that Jones took a step toward him, and that, fearing for his life, he threw Jones to the ground in an emergency takedown. Jackson further testified that, when Jones stepped toward him, Jones did not appear to have a weapon. During the arrest, Jackson felt as though Jones was threatening him with imminent battery. The specifics are lacking.

Jones's version is markedly different. Jones testified that Jackson did not say anything when he first found him in the gangway. Jackson then pushed Jones and White

---

[2] Although Jackson makes reference to an "audio recording of the radio communication of the events preceding, during and after Jones's arrest," Defs.' Reply in Supp. of Summ. J. 4, neither party has attached a transcript of the recording to the summary judgment pleadings.

3

against the wall in the gangway, handcuffed them together, and told them to sit down. The boys complied with Jackson's command. As Jones sat down, Jackson, without warning, punched him in the face with his closed fist. Jones took no steps toward Jackson, nor did he put his arms out toward him. The punch to the face caused Jones's nose to immediately bleed. Jackson did not offer Jones a tissue or any first aid attention. Jackson, however, testified that he never saw Jones's nose bleed.

It is undisputed that Jackson searched Jones and White after they were in handcuffs and did not find any drugs, stolen goods, or weapons. Jackson subsequently announced over the radio that he had found the two boys. There is no dispute that Jackson detained the boys in the gangway between the two buildings.

Jackson—still unaware of what Jones and White were doing before they ran from the police—took the boys, in handcuffs, to the Third District police station. The boys were subsequently turned over to Jenkins and Sowell, who completed the arrest report and original case incident report. Because Jones was a minor, he had to speak with a youth officer. Around this time, Jones's mother arrived to the police station. After speaking with the youth officer, Jones saw his mother at the police station. Jones was detained and sent to the Juvenile Detention Center on 11th Street and Hamilton in Chicago, where he remained in custody overnight.

The next morning, while still in custody, Jones saw that his nose was swollen and both of his eyes blackened. Jones was released into his mother's custody that morning, at which time she took him to the University of Chicago Medical Center for treatment. Jones was diagnosed with a transverse minimally displaced fracture of the nasal bone, for which he has received follow-up treatment on two occasions. Jackson denies that the

treatment was related to any injuries caused by or incurred during Jones's February 15 detention. While Jones was ultimately charged with reckless conduct, the arrest did not result in an adjudication of guilt within the juvenile court system.

**B. Procedural History**

On April 21, 2010, Jones filed a Second Amended Complaint alleging false arrest, unreasonable seizure, and excessive force under 42 U.S.C. § 1983, and illegal detention and assault and battery under Illinois state law. Jackson, jointly with the City of Chicago, now moves for partial summary judgment on the false arrest, unreasonable seizure, and illegal detention claims.

## II. DISCUSSION

**A. Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the record and draws all reasonable inferences in the light most favorable to the nonmoving party. Zerante v. DeLuca, 555 F.3d 582, 584 (7th Cir. 2009). The Court does not "make credibility determinations [or] weigh the evidence." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citation omitted).

To survive a motion for summary judgment, the non-moving party must identify "with reasonable particularity" the evidence in the record that shows a genuine triable dispute of material fact. Hemsworth, II v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007). The movant will prevail where the record as a whole demonstrates that "a rational trier of fact could not find for the non-moving party." Williams v. OSI Educ. Servs., Inc., 505 F.3d 675, 678 (7th Cir. 2007) (internal quotation marks and citation

omitted). "Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied." Payne, 337 F.3d at 773 (citation omitted). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and must present sufficient evidence to create genuine issues of material fact to avoid summary judgment." Sow v. Fortville Police Dep't, 636 F.3d 293, 300 (7th Cir. 2011) (citing McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010)).

**B. Jackson and the City of Chicago's Joint Motion for Summary Judgment**

*1. False Arrest & Unreasonable Seizure*

Section 1983 allows citizens whose constitutional rights have been violated by public officials to sue those officials in their individual capacities. See Fleming v. Livingston County, Ill., 674 F.3d 874, 878 (7th Cir. 2012). Jones alleges that Jackson violated his Fourth Amendment right to be free from unreasonable searches and seizures by arresting him without probable cause. Jackson moves for summary judgment on the ground that he had probable cause to arrest Jones or, at a minimum, that he is entitled to qualified immunity. The Court analyzes the false arrest and unreasonable seizure claims together. See Gonzalez v. Vill. of W. Milwaukee, 671 F.3d 649, 655 (7th Cir. 2012) ("'False arrest' is shorthand for an unreasonable seizure prohibited by the Fourth Amendment.") (citation omitted).

    **a. Probable Cause**

"The constitutionality of a warrantless arrest for a criminal offense turns on the existence of probable cause for the arrest." Sow, 636 F.3d at 301 (citing Woods v. City of Chi., 234 F.3d 979, 992 (7th Cir. 2000)). "[I]f [the officer] actually did have probable

cause to arrest [the plaintiff], then a Fourth Amendment claim for false arrest is foreclosed." Fleming, 674 F.3d at 878 (internal quotation marks and citation omitted). "A police officer has probable cause to arrest when, at the moment the decision is made, the facts and circumstances within her knowledge and of which she has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." Id. at 878-79 (internal quotation marks omitted); see also Beck v. Ohio, 379 U.S. 89, 91 (1964). "This standard 'does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable.'" Fleming, 674 F.3d at 879 (quoting Qian v. Kautz, 168 F.3d 949, 953 (7th Cir. 1999)). Indeed, the "rule of probable cause is a 'practical, nontechnical conception' that affords the 'best compromise' between the interests of individual liberty and effective law enforcement." Woods, 234 F.3d at 996 (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). "Arresting officers may draw reasonable inferences based on their training and experiences in determining whether suspicious circumstances rise to the level of probable cause." Thompson v. Wagner, 319 F.3d 931, 934-35 (7th Cir. 2003). The existence of probable cause "turns on the information known to the officers at the moment the arrest [was] made, not on subsequently received information." Id. (internal quotation marks and citation omitted).

Jackson argues that, based upon all of the information known to him at the time of the arrest, he reasonably concluded that Jones had committed a crime. At the time of the arrest, Jackson knew: (1) that Jones was running from police officers;[3] (2) that those

---

[3] The Court rejects Jones's argument that Jackson did not know that Jones was running from the police. A reasonable officer in Jackson's position would assume, in light of the police radio call requesting police assistance, that the fleeing individuals were indeed fleeing from the police and

7

officers made a radio call stating "that someone was running from the area of 64th and Cottage Grove. They described what they had on, and he was holding their [sic] side."; (3) that "holding his side" meant "someone" may be carrying a weapon, but that Jones did not appear to be carrying a weapon immediately prior to the arrest; and (4) that Jones was hiding from police officers. For the following reasons, this is not enough to establish a prima facia case for probable cause sufficient to grant summary judgment.

With respect to the radio call, Jackson, citing Sow, contends that when an officer "receives information from a third party whom it seems reasonable to believe is telling the truth, the officer has probable cause to effectuate an arrest." Defs.' Reply in Supp. of Summ. J. 3. It is true that "[t]he police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency." United States v. Parra, 402 F.3d 752, 764 (7th Cir. 2005) (internal quotation marks omitted); see also United States v. Nicksion, 628 F.3d 368, 376 (7th Cir. 2010). However, under those circumstances, an arrest is only proper if "the knowledge of the officer directing the . . . arrest . . . is sufficient to constitute probable cause." Nicksion, 628 F.3d at 376 (internal quotation marks omitted). Jackson cannot satisfy this standard. First, there was no "officer directing the arrest." The only fact before the Court on this issue is a radio call stating that someone was running holding his side. Because the Court must draw all inferences in favor of Jones, see Payne, 337 F.3d at 773, it rejects Jackson's argument that an instruction to arrest the fleeing boys was implicit in the radio call.

---

not, as Jones suggests, simply running. Jones admits so much in his Response to Defendants' Local Rule 56.1 Statement. See Pls.' Resp. to Defs.' L.R. 56.1 Statement ¶ 20.

Second, considering the evidence in the light most favorable to Jones, at no point did Jenkins or Sowell have knowledge sufficient to constitute probable cause. When they approached the boys outside of the Family Discount store, they were attempting to conduct a field interview to ascertain information about an alleged "disturbance." There is no dispute that, as the officers first approached the boys, the officers did not have probable cause to arrest them. Jones claims that he ran along the sidewalk as soon as he saw the police car approach. Further, he claims that the police did not say anything to him. On Jackson's motion for summary judgment, the Court must view the facts in Jones's favor, even if Jones's version were to be deemed less credible. See Payne, 337 F.3d at 773 (holding that, even where testimony by the party opposing summary judgment is not credible, "we must view those facts in the light most favorable to the party opposing the motion. As a result, we will fill in the remainder of the relevant story with [the opposing party's] version of the facts, although we emphasize that in doing so, we do not vouch for their truth"). Jackson has not demonstrated that Jenkins, Sowell or any other officer "could have formed a reasonable belief that the arrested person had committed a crime." Mahoney v. Kesery, 976 F.2d 1054, 1058 (7th Cir. 1992).

Jackson's argument is further weakened by his reliance on Sow. Jackson contends that Sow is somehow "not specific to its facts" and that it is "of no consequence that the information received by the officer in Sow was more detailed than that received by Jackson." Defs.' Reply in Supp. of Summ. J. 6. Not so. Critical factual differences make this case distinguishable from Sow, and the distinctions matter.

In Sow, the arresting officer received information from three sources—a local post office employee, the post office headquarters in Baltimore, Maryland, and the postal

inspector in Indianapolis, Indiana—all stating that the plaintiff had committed forgery with respect to an allegedly fraudulent money order. 636 F.3d at 302. Moreover, "in addition to the information received from these sources, [the arresting officer] relied on his own observations and the fact that Plaintiff could not produce a receipt for the $1000 money order." Id. The court held that, "[b]ased upon all of the information [the arresting officer] received from various sources, he had ample reason to conclude that the $1000 money order in Plaintiff's possession was fake and reasonably concluded that Plaintiff had committed the offense of forgery." Id. (emphasis added). Unlike the arresting officer in Sow, Jackson relied on one limited communication, and the communication did not contain facts from which criminal activity can be inferred on summary judgment. Sow, therefore, does not support Jackson's argument.

In addition to the above, Jackson argues that, "given that Jones had run from police officers and was hiding from police officers when Jackson found him, it was reasonable for Jackson to believe Jones had committed a crime or was in the process of committing a crime when he encountered [Jenkins and Sowell]." Defs.' Joint Mem. of Law in Supp. of Summ. J. 6. In support, Jackson relies on Illinois v. Wardlow, 528 U.S. 119 (2000). Wardlow, however, held that unprovoked flight creates reasonable suspicion sufficient to justify a Terry stop, not an arrest. See, e.g., United States v. Lawshea, 461 F.3d 857, 860 (7th Cir. 2006) ("Since Wardlow, we have made it clear that when a suspect attempts to flee from the police, the officers have reasonable suspicion to pursue the suspect in order to conduct a *Terry* stop." (citing United States v. Breland, 356 F.3d 787, 791 (7th Cir. 2004))); see also Wardlow, 528 U.S. at 124 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight—wherever it

occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." (internal citations omitted) (emphasis added)). Under Wardlow, Jackson's knowledge of Jones's unprovoked flight from the police was sufficient to establish reasonable suspicion to conduct a Terry stop, but not probable cause for an arrest.

In sum, considering the facts in the light most favorable to Jones, Jackson has not established that he had a reasonable belief that Jones had committed or was committing a crime. Once Jackson detained Jones and determined that he was not carrying a weapon, Jackson had the opportunity to conduct a limited investigation into Jones's flight and the earlier disturbance complaint. Rather than conduct such a limited investigation, Jones was arrested without inquiry, taken to the police station, and held over night at a Juvenile Detention center. The Court finds that a well-trained officer could not have reasonably assumed that a crime had been committed on these facts. In this circumstance, Jackson should have conducted at least some investigation after he detained Jones. See Sow, 636 F.3d at 302 ("An officer should pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation, but once an officer has established probable cause, he may end his investigation.") (internal quotation marks omitted); BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986). ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place."). Because Jackson "failed to avail himself of the opportunity to elicit further facts which would have indicated that the arrest should not
11

have been made," his arrest of Jones was "without the requisite probable cause." BeVier, 806 F.2d at 128.

### b. Qualified Immunity

In the alternative, Jackson argues that he is entitled to qualified immunity. Qualified immunity "protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Gonzalez, 671 F.3d at 657 (internal quotation marks and citation omitted). In determining whether qualified immunity applies, the Court asks: "(1) whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a constitutional violation; and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation." McComas v. Brickley, 673 F.3d 722, 725 (7th Cir. 2012) (citing Jones v. Clark, 630 F.3d 677, 680 (7th Cir. 2010). If both questions are answered in the affirmative, the officer is not entitled to qualified immunity. Because the Court has already answered the first question in the affirmative, it turns to the second.

"To determine if a right was clearly established at the time of an alleged violation, we look at 'whether it would be clear to a reasonable official that his or her conduct was unlawful in the situation.'" Id. (quoting Carvajal v. Dominguez, 542 F.3d 561, 566 (7th Cir. 2008)). In the context of false arrest, a defendant is entitled to qualified immunity when, if there is no probable cause, "a reasonable officer could have mistakenly believed that probable cause existed." Fleming, 674 F.3d at 880 (internal quotation marks omitted). This standard, often dubbed "arguable probable cause," is established "when a reasonable police officer in the same circumstances and with the same knowledge and

possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." Id. (internal quotation marks omitted).

As discussed above, viewing the facts in the light most favorable to Jones, Jackson has not established that he had probable cause to arrest Jones. Jackson argues that, even if he lacked probable cause for the arrest, he is entitled to qualified immunity because it is not clearly established that he had no right to rely on the radio call or on his knowledge that Jones was running and hiding from police. Jackson's argument is without merit.

The probable cause standard—requiring an officer's knowledge of the facts to be sufficient to warrant a prudent person in believing that the suspect had committed or was committing a crime—was clearly established when Jones was arrested in 2010. See, e.g., Jenkins v. Keating, 147 F.3d 577, 585 (7th Cir. 1998) (noting that this right was clearly established by at least 1991). The question, then, is whether, in light of this clearly established right, a reasonable officer could have believed that Jones's arrest was lawful.

With respect to Jones's running and hiding, the law has been clear since 2000 that unprovoked flight from the police is sufficient to establish reasonable suspicion, but not probable cause. Wardlow, 528 U.S. at 124.

Regarding the radio call, "'where a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed.'" Duran v. Sirgedas, 240 F. App'x 104, 115 (7th Cir. 2007) (quoting Rogers v. Powell, 120 F.3d 446, 455 (3d Cir. 1997)). In Duran, the defendant officer was part of a group of

reinforcing officers dispatched to a "chaotic scene" that was "escalating" and in which the officers were "mostly outnumbered." Id. The defendant officer was then told by another officer to arrest the plaintiff. The court held that, "[u]nder these circumstances, [the defendant officer] could reasonably rely on Officer DeCianni's statement that he wanted [plaintiff] arrested as a basis for that arrest." Id. However, the court continued to explain that, "[i]n other circumstances, it might be appropriate for an officer to first obtain additional information regarding the basis for the arrest." Id.

Unlike Duran, Jackson was not relying on a statement by another officer to arrest Jones. Considered in the light most favorable to Jones, the radio call did not alert Jackson that Jones had committed a crime, and it did not request that Jones be arrested. Moreover, at the time of the arrest and handcuffing, the scene was neither chaotic nor escalating. Rather, the only facts asserted over the radio call to justify the arrest were that someone was running from the police while holding his side. This message was sparse. Further, it appears that Jackson did not communicate with Jenkins after he detained Jones in the gangway. As set forth above, it is clearly established that, in this circumstance, Jackson should have conducted at least some investigation after he detained Jones to determine probable cause. Sow, 636 F.3d at 302; BeVier, 806 F.2d at 128. Instead, Jackson "close[d] . . . his eyes to facts that would help clarify the circumstances of [the] arrest," BeVier, 806 F.2d at 128, and arrested Jones without knowledge of any crime he might have committed, see Rabin v. Cook Cnty., 837 F. Supp. 2d 949, 959 (N.D. Ill. 2011) ("[A]ny reasonably competent officer would have knowledge of the law he was enforcing."). Accordingly, at the summary judgment stage, Jackson is not entitled to qualified immunity on the false arrest and unreasonable seizure claims.

As a final matter, the Court notes that this result is consistent with the Supreme Court's concern in United States v. Hensley that, "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." 469 U.S. 221, 231 (1985) (internal quotation marks omitted). As set forth above, Jackson was entitled to rely on the radio communication to detain Jones and conduct a Terry stop. However, on these facts, considered in the light most favorable to Jones, the detention went too far.

### 2. *Illegal Detention*

Jackson first argues that summary judgment should be granted on Jones's state law illegal detention claim because Jackson had probable cause to arrest, and therefore detain, Jones. Because the Court has found there was no probable cause to arrest Jones, this argument fails. See, e.g., Brooks v. City of Aurora, Ill., 653 F.3d 478, 486 (7th Cir. 2011) (finding that the probable cause inquiry is the same for § 1983 false arrest and false imprisonment/illegal detention claims); Taylor v. Bush, No. 04 C 3396, 2006 WL 862855, at *3 (N.D. Ill. Mar. 30, 2006) ("[T]he existence of probable cause [also] precludes the common law actions of false arrest and imprisonment and malicious prosecution." (internal quotation marks omitted)).

Jackson also argues that Jones's illegal detention claim is barred by the Illinois Local Governmental and Governmental Employees Tort Immunity Act (the "Immunity Act"), which provides that a "public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and

wanton conduct." 745 ILCS 10/2-202. Willful and wanton conduct "means a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210.

Jackson argues that there is no evidence that he "acted intentionally, with utter indifference to or with conscious disregard for the safety of Jones in detaining him." Defs.' Joint Mem. of Law in Supp. of Summ. J. 13. To the contrary, there is a genuine dispute of material fact on this issue. Considered in the light most favorable to Jones, there is evidence that Jackson acted with utter indifference or conscious disregard for Jones's safety when he made the arrest. For example, Jones testified that, during the arrest, Jackson punched him in the face with a closed fist. Jones testified that the punch was unprovoked, as he (Jones) neither stepped toward Jackson nor attempted to flee once Jackson found him. Jones further testified that Jackson's punch caused his nose to bleed, and that Jackson did no offer him first aid treatment. The Court is aware that Jackson strongly disputes Jones's testimony. Jones's physical condition while in juvenile detention, however, is not contradicted. At this stage, the Court must consider the evidence in the light most favorable to Jones. Accordingly, the Immunity Act does not bar Jones's illegal detention claim.

## III. CONCLUSION

For the foregoing reasons, Jackson and the City of Chicago's joint motion for partial summary judgment is denied.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATED: July 30, 2012